Case number 22-3154 from Nebraska, Christine Bordeaux v. Cheryl Bicknase et al. Good morning counsel, Ms. Chalupka. Yes. You may proceed. Good morning. Judge Shepard, Judge Cobus, Judge Strauss, thank you for coming to Omaha. Thank you for hearing the case. My name is Maren Lynn Chalupka. I'm here from western Nebraska. I represent Christine Bordeaux. We respectfully ask this court to find genuine issues of material fact warranting the denial of qualified immunity even with the defense's facts deemed admitted. Typically when the highest level administrator in a prison is named as a defendant, it's based on a claim of Monell-type liability or some kind of supervisory theory. But there are genuine issues of material fact as to Warden Denise Davidson's direct involvement in the failure to keep Erica Jenkins, an inmate, separate from Christine Bordeaux. It is an extraordinary event when the lead prosecutor from the state's largest county drives 100 miles each way to personally warn a prison warden, your inmate presents a live risk of harm to my informant, which is what happened here. Prosecutors need the engagement of corrections professionals to secure the trusts of informants in major cases. And in this case, the Douglas County attorney, for the first time ever to our knowledge, drove 100 miles to make it clear what the risk Erica Jenkins presented was to his informant. The warden implored Warden Davidson to keep Christine Bordeaux safe from Erica Jenkins, and Warden Davidson told him we would take the steps necessary to make sure that we kept Bordeaux safe. So what steps did the warden take? Well, that's not clear, Judge Kobus, because of the number of different ways that Warden posed about this. Now the simple and most obvious step, which is one of the ways that she responded she did, would be to say that she's going to give an order to place Christine Bordeaux and Erica Jenkins in central monitoring. That's one of the answers that she said that she did. She said in one of her answers that she gave her, she told her supervisor, I'm going to tell them to put these two inmates in central monitoring. And that was one of her answers that she gave. She said that she told her central office supervisor the prison would put Bordeaux and Jenkins in central monitoring. But about five pages later in her same deposition, she said that she did not tell her supervisor that, that she would just say that we'll try to keep these two inmates separate. And although the warden maybe five pages after that admits we should have put them in central monitoring at that time, the facts show that without dispute, that never happened before the assault. Now to the contrary, on April 17th, Ms. Davidson personally signed an inmate classification form that shows that Bordeaux is classified with central monitoring marked no. And while when it was time for the prison's lawyer to ask their questions, the lawyer said, well doesn't it just auto-populate? This is just auto-populated. And she said, oh, oh, well, okay, that's all right. Yeah, sure, we auto-populated. When I asked her questions about it, she gave different answers, both before and after prison's counsel. When I had asked her questions, her response was, well, you know, I should have asked, you know, the unit administrator, we need to get that fixed. We need to change that to central monitoring. That's, you know, what I should have done. That was one of her answers. And after the prison's lawyers, when I got to ask questions on redirect, her answer was also different. Her answer then was that she knowingly chose to say we're going to put it, to check no for central monitoring and create confusion for the housing staff with no apparent end date in sight for having the central monitoring checked no. And here's the other kicker, you'll notice. The other way to inform victim potential for Christine Bordeaux was checked low, low. And this is after Nebraska's top prosecutor had come out and implored Gordon Davidson personally to say keep this person safe because Erica Jenkins is going to harm her. Now, you can deem the facts admitted. You can deem those facts admitted, Your Honor, but the record still has to ensure that it supports the statement of facts that have been admitted. And in this case, summary judgment was entered, qualified immunity was given without a record that supports the facts that were deemed admitted. The record does not support it. The record simply doesn't support it. And that's the problem. Even with the facts deemed admitted, qualified immunity needs to be reversed. Wasn't all this stuff about central monitoring, wasn't it all accidental or at least that's the construction you could have based on the admitted facts? Which is to say that the investigation was ordered to get something in central monitoring. The report just never reached the leadership of the prison. Somehow it got lost. The officer who did the investigation said I turned it in. The warden and the other supervisors say no, you didn't. We never got it. And therefore it never got answered. It was just, it just got lost. You raise an excellent point, Judge Strauss. It might have been accidental, but it was in this case it was not reckless or it wasn't negligent. In this case, given the circumstances, it was reckless. It was deliberate indifference. If there hadn't been that visit from the prisons or busy places, paperwork gets shuffled. But in this case, we had Nebraska's top prosecutor making this personal visit and... But just to be clear, that argument only goes to the warden, correct? I'm sorry? The argument you're making only affects the warden, is that correct? Because was information about, hey, the top prosecutor was here, this is really important, was that ever conveyed to the other defendants? Judge Kobus, that also raises an excellent point because Warden Davidson said that she told her executive team that the prosecutor had visited him. And the executive team included Ms. Goloday. Ms. Goloday, who was one of the defendants here, said that she heard at a meeting that the top prosecutor had gone to visit Ms. Davidson, the warden. And so she was aware of that as well. There were other prison people, there were other prison administrators who were not named as defendants because they had done the things that were within their power. Sean Settles, who was the security administrator, the top security administrator, did everything which was within his power. He could not initiate a central monitoring investigation. That was not within his wheelhouse and he could not do that. But Goloday and Davidson, even if they knew, the Davidson ordered the investigation, which again led to the lost report, at least according to the admitted facts. But then the problem with holding Goloday and Davidson liable here is sort of different, which is I don't think there's any evidence that they knew that the two were being placed together. In other words, Davidson or Goloday or both had said, don't place these two together. And somehow that hadn't gotten communicated to the line staff at the prison. And so if they don't know that they're being held together, how is that deliberately indifferent? Well, they knew that, Davidson knew that it wasn't, she knew when she signed off on the classification form that central monitoring had not been enacted. She certainly knew that then. Did she know it should have been at that point? She knew it should have been. She certainly could have said, I am not going to sign this form until it says yes for central monitoring. I'm not going to release this inmate from the diagnostic and evaluation unit and send her into general population until central monitoring is done. So when it got to Goloday, she was the one who had to approve the cell, putting them in the same cell, and she knew that those two were being put in the same cell together. No, that wasn't Goloday. Goloday worked in the diagnostic and evaluation unit. So the two who knew they were in the same cell would be false overlay and Bicknase. Okay, I was asking about Goloday and Davidson. Goloday and Davidson. That they didn't know that those two were being housed together. Am I right about that? You are, you would be correct on that. Okay, and then the other two don't know that the two, Bicknase and I forget the name of the other one. False overlay. Yeah, didn't know that there was any dispute between those two, right? Because central monitoring had not been proposed. They were in on the meeting with the prosecutor, etc., etc. You're correct. However, central monitoring is the way that everyone in the prison has access to know who should not be put in a room together. That's the simplest and clearest way. If you put two inmates in central monitoring, then whenever there's a question, should we let these two inmates room together, should we let them work together, should we let them go to school together, should we let them be on the yard together, all we have to do is get on central monitoring and, whoa, here it says Erica Jenkins and Christine Bourdeaux are in conflict and they shouldn't be together. Obviously, we can't do this. I understand all that, but when you get back to Davidson and Goloday, Davidson orders the investigation. Or not. So I think the only way, well, admitted facts order the investigation. And then the only way she can be held liable, I think, is your argument that she should have just put them both on central monitoring even without the investigation. I think that's the argument you have to make because we have to assume on the admitted facts that it just, the report didn't get delivered, it got lost in somebody's inbox, mailbox, whatever. What's wrong with that sort of line of analysis? On the admitted facts, the admitted facts clash with, when you look at the RDoC, 14110, page 63, which is the initial classification form, that is the damning page. That's where Warden Davidson signed off on the initial classification form that says central monitoring, no, low victim potential. And that's where Davidson should have said, I'm not releasing this inmate from diagnostic and evaluation into general population until she is on central monitoring. The end, full stop, end of story. So we have to get past the admitted facts to get to that. That's your, I just want to understand the argument. The argument is we have to ignore the admitted facts sort of ruling by the court, overturn it, whatever you want to call it, in order to get to that particular theory that you're arguing. Well, and I feel like I'm saying something radical, except that I'm not, Judge Strauss. There's, the admitted facts have to be supported by the record. And I'll turn in a 28J letter on this, because I found the magic case, as I typically do after I turn in a brief. The Second Circuit Authority, Giannullo v. City of New York, 322F3139, which says that, simply put, that a record has to support a statement of facts, even when the facts have been deemed admitted. And simple as that. And what the Second Circuit wrote was that not verifying the record, the assertions that have been deemed admitted, would derogate the truth-finding functions of the judicial process by substituting convenience for facts. And that language has been repeated extensively within the Second Circuit. It's also been adopted by the 11th. I acknowledge this circuit has not adopted it. But nothing about that seems that radical. The record has to support the facts. And when you look at the initial classification form here, that says that, that Judge, that Warden Davidson, who had had this extraordinary meeting with the Douglas County Attorney, saying, keep these women separate. And then she signs off on this form with that knowledge given right to her. Low victim potential. When she's been told, this inmate is going to hurt my informant, she signs off on it and then she never does anything about it. Well, here's a question I have. And no one's touched on it so far this morning. What did the prosecutor know about these relationships that the appellant didn't know? Because the appellant had no objections to this, had contact with Jenkins within the prison, didn't request any particular protective arrangements. So what's going on there? What did the prosecutor bring to the table here as far as information that the appellant did not, either didn't know or didn't appreciate? Well, Judge Shepard, actually that's, there's just another point where what the district court found is simply not supported by the record. The, the, right before she was released from general population, or into general population, and this was, this is in the record, Ms. Bordeaux said to Jonna Williams, a mental health person, and Ms. Galladay was aware of this, I am afraid of Ms. Jenkins because I testified against her, because she's my cousin. I testified against her. And that's in the record, number one. And if you look at RDoC 141-20, page 83, and this is in the critical incident review, there is a report involving Ms. Bordeaux and Eric E. Jenkins that took place six days before the assault that shows that there was an incident involving these two, six days before the assault seen by security staff. And that's in the report, or in the critical incident review, that shows that there was some interactions that was noticed by security staff. So once again, the, the report, you know, the admitted facts have to still be supported by the record. And in this case, I'm running myself right out of, right out of my rebuttal time, which maybe is a good thing, but, but I would say that in this, this is a situation where qualified immunity is not supported by the admitted facts. This is, we have an extraordinary situation here with a county attorney driving out to see the warden. This is not supported in this case. And I would ask that this court reverse. Thank you for doing the argument in this case. I greatly appreciate it. Thank you very much. All right. And the athletes have divided time, I believe. Thank you, Your Honor. That's correct. May it please the court. My name is Cameron Hassan. I'm appearing on behalf of the co-athletes, Steve Hunsecker. As the court noted, the co-athletes have split time here, so I will keep this short, especially because during oral argument, the issues that the court has just entertained are unrelated to my client. Your Honors, the issues on appeal for Mr. Hunsecker are narrow and straightforward. Binding a circuit precedent confirms that naming a John Mill defendant is not a mistake to qualify under Rule 15c and the Relations Act Doctrine, which would be an exception to the statute of limitations barred. This court's decision in Hagelin, which was a 2017 case, confirms that naming a Doe defendant is an intentional act. The court made that holding while specifically acknowledging that a Doe designation might have arisen from some inadequate knowledge held on the part of the plaintiff. But inadequate knowledge, it doesn't matter. Designating a Doe defendant is an intentional act. It is suing an improper defendant and, as a result, cannot qualify under Relation Act Doctrine. Hagelin is binding precedent that bars appellant's claim over Mr. Hunsecker. I won't go over the record, the procedural posture here. I will represent to the court that between the time of the incident, the accrual date, the time that the assault happened, and the expiration of the four-year statute of limitations, Mr. Hunsecker was not named in the case. Only Does were. It was only after the expiration that a Doe was sought to be replaced by Mr. Hunsecker. Under those circumstances, and as governed by Hagelin, the district court correctly granted the motion to dismiss and dismiss Mr. Hunsecker. So, for those reasons that were fully set forth in the briefing, Mr. Hunsecker respectfully requests that this court confirm his dismissal, and unless the court has any questions for me, I would like to cede the remaining time to my, quote, colleague counsel, especially because of the issues that have been discussed thus far. Thank you. Thank you. Mr. Schmidt, you just picked up three extra minutes. Wonderful. I hope to not use it. May it please the court, I'm Chris Schmidt. On behalf of Appaloose, Davidson, Gallaudet, and Fultz-Overly, all of whom were dismissed in the district court's third order that I must be affirmed. The relief Ms. Bordeaux seeks requires that she clear several, frankly tall hurdles that the facts and law just don't allow her to do. First, she bears the burden to establish a constitutional violation, which itself presents multiple challenges, many of which have been addressed somewhat already this morning. There must be subjective knowledge of a substantial risk, which imposes this really difficult, must-have-known standard that can be difficult to meet, as the court recognized just a few months ago in the Hodges opinion, and Judge Codes, I believe you're on the panel for that one. And then there must be conscious disregard of that risk, which transcends negligence, transcends gross negligence, even civil law recklessness, and gets all the way up to criminal recklessness that simply doesn't exist when officials take affirmative and deliberative steps to prevent any assault. Judge Codes, you started to touch on that during Ms. Chalupka's argument. Or when the plaintiff disavows the risk, as happened here on multiple occasions with the denial of protective custody and things like that. Judge Shepard, you touched on that. And then Judge Strauss, as to the knowledge piece, you're absolutely correct. There's no evidence that Warden Davidson, Ms. Galladay, or Ms. Fultz-Overly had any knowledge that Ms. Bordeaux and Ms. Jenkins shared a cell after months of peaceful coexistence and separation. And then second, Ms. Bordeaux must overcome the official's qualified immunity, which requires she cite to authority that makes liability clearly established. And I think it's telling that we spoke about a lot of facts during the first 15 minutes here this morning, but what we didn't hear was any authority that would have put these officials on notice, that the steps that they were taking, particularly in light of Ms. Bordeaux's own statements and things like that, rendered their conduct unconstitutional. Wouldn't that be obvious, though? I mean, again, assuming there was knowledge, assuming away some of the things that, you know, these factual issues, wouldn't it be obvious that putting two people in a cell together, one of whom testified against the other and put them in prison, I think for life or close to it, that that could be a problem? Perhaps, if we're dealing with one prison official who had that knowledge and made the cell assignments and things like that, and that simply does not exist here. And so what does render it very non-obvious is the fact that these steps were taken. Judge Coates asked about that. Before Ms. Bordeaux ever arrived at the prison, she attempted to transfer her out of state as the institution we're talking about is the only female institution in the state. She was offered protective custody, which she rejected after being informed of the risk. The security division increased their monitoring efforts related to both of these individuals, and she was placed on a major watch list. There's evidence in the record that supports the undisputed and deemed admitted facts, but there are multiple conversations about how to keep these two separate and safe. Judge Strauss, you mentioned the phrase accidental. Wasn't it an accident that central monitoring wasn't implemented here? I believe the district court used the phrase derailed by miscommunication. In this court, in a previous case, used the term lack of coordination in blades, where the intent is there and the opposite of indifference. And then adding another layer to that, on the qualified immunity problem, is we have situations here, I mentioned a minute ago, where Ms. Bordeaux, the very day she arrived, a lieutenant spoke with her, and Ms. Bordeaux both informed that lieutenant and wrote in handwriting, I do not fear for my dress. She was offered protective custody and denied it. She said to Ms. Gallaudet several times, I have no victim potential. Understanding the comment that was vague and speculative made to Dr. Williams, they also resided in the same cell for three days, during which time Ms. Bordeaux testified, did you have any idea that Ms. Jenkins wanted to assault you? No. There's no evidence that at any time during those three days, any of the officials were made aware of the problem or any concern by Ms. Bordeaux. What about the roommates that somebody's going to send it to? I forget which one, but said, hey, I think there's going to be a fight here soon. Sure. So that was a statement made by roommate Deb Novak to Angela Foltz-Overly, who arrived after Ms. Bordeaux's arrival and when all of these discussions and efforts were underway. And the biggest point in response to that, Judge Strauss, is Ms. Foltz-Overly did not subjectively draw the inference of risk. She didn't have that context. She didn't have that knowledge. And that's squarely in Hodge's territory, where a prison official must subjectively draw and understand the risk presented. And here, that did not happen. Ms. Foltz-Overly understood it to be a concern about Ms. Novak's own risk of safety and things like that, made in the context when a lot of inmates were trying to manipulate their movements and assignments and things like that. And I think if you compare that to other cases where there have been expressed and specific threats, a statement made to somebody who lacks any knowledge of unless there are any further questions, I don't have anything further. Thank you. Thank you very much. May I please record? I'm Melanie Whittaker-Montios. Can you hear me? You need to speak up a little bit. Okay, I'll try. I represent Cheryl Bicknase, an athlete in this case, and I have very little to say in this matter other than we request that you affirm the grant summary judgment in this case. The record supports it. The facts are being admitted. Do you have any questions for me? Ms. Bicknase is the unit manager. I think we have no questions. Okay, great. Thank you. All right. Okay, how much time does Ms. Cheryl have left? No. Luke used it all up. We'll give you two minutes to respond since the athletes left, so time on the table. It's never gone well for me when I've accepted that invitation. Well, you don't have to use this time if you don't want to. Hesitantly, I will accept the invitation to respond to the characterization of Ms. Foltz-Overlie's response on inmate Novak approaching her regarding the report that her roommates were about to fight. I disagree that she subjectively did not have any knowledge that this was going to be a problem. When a unit administrator, which is the top unit position in the prison, is approached by an inmate saying, my roommates are about to fight, and there's a question of fact there. She definitely knew that one of those inmates was one of the most ultra-violent inmates in the prison. She acknowledged that she knew that one of them was Erica Jenkins and she knew how violent Ms. Jenkins was. But aren't you, you're overstating it. I don't think they said, my roommates are going to fight. I think the record shows that there's going to be a fight or something in the passive voice. Isn't that different? No, I think the record says that she knew, said that my roommates were going to fight. I believe that's what the record said, that her roommates were going to fight. And that one of them was Erica Jenkins. And then depending on who you, on which version is credited, and there's a dispute there, Ms. Fultz-Oberle had testified at the criminal trial for Ms. Jenkins, and so there were a couple different versions of what was said. One of them, I think, was Ms. Novak's statement to an investigator where she said, I told her that Christine Bordeaux was the other person. I think Ms. Oberle said, I didn't know who the other person was, but I did know that one was Ms. Jenkins. And Ms. Novak, I think, had said to the investigator, I told her the other person was Christine Bordeaux. Either way, for Ms. Oberle to say nothing except, well, then you can get out of the way, but then do nothing else, to say that there's no subjective knowledge that there could be a problem here is nuts. And to say that this is, it's hard to say that we should countenance and judicially protect that level of indifference to the risk of harm at that point. There was at least a question of fact, even with the facts deemed admitted, according to what is in the record. With that, I'm out of time and will wisely flee. Thank you, Your Honor. Thank you. Thank you, counsel. We appreciate your arguments this morning. And this case is submitted. Court will render a decision as soon as possible. Please stand aside. Please call our next case.